IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW L. BARTON, individually and on behalf of himself and all others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>WALMART INC.,<br><br>       Defendant. | Case No. 1:21-cv-04329<br><br>The Hon. John F. Kness, District Judge<br><br>The Hon. Young B. Kim, Magistrate Judge |

# **<u>DEFENDANT WALMART INC.'S REPLY BRIEF IN SUPPORT OF THE MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM</u>**

Plaintiff's opposition (ECF No. 35, "Opposition" or "Opp.") to Walmart's motion to dismiss (ECF No. 19, "Motion") relies on a strained construction of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA") to claim that a "biometric *identifier*" does not have to identify any particular person.  This ignores the statute's plain language and misconstrues the administrative and judicial opinions interpreting the statute.  Plaintiff offers no rejoinder to the arguments in Walmart's Motion demonstrating that BIPA only applies to voice recordings used to identify the speaker, unlike the technology described in Plaintiff's complaint.

Equally meritless is Plaintiff's argument that even if the voice recordings here cannot, by themselves, identify any individuals, they are still "biometric identifiers" under BIPA because they can be used in combination with other information, like an employee passcode, to identify an individual.  There is no allegation that they are actually used that way—in fact, the system used by Walmart identifies the employees by their passcodes alone, then uses the voice recordings to facilitate communication with the employee.  At any rate, if a piece of data must rely on *other* information to identify a person, that data, by definition, cannot be a "biometric identifier." Plaintiff's reading flies in the face of BIPA's text, structure, and purpose—and should be rejected.

Next, Plaintiff argues that even if Walmart's interpretation of "voiceprint" is correct, the First Amended Complaint (ECF No. 17, "FAC") plausibly states a claim under BIPA.  Plaintiff complains that Walmart's arguments rely on materials outside the FAC, but Walmart's Motion only cites to the FAC itself.  Further, the Opposition does not cite a single factual detail in the FAC supporting the inference that the *speech*-recognition system was a *voice*-recognition system.

Because Plaintiff has already amended his complaint after a previous motion to dismiss was brought, and because the Opposition fails to identify additional facts Plaintiff could allege if given leave, amendment is futile and the Court should dismiss this case with prejudice.

I. ARGUMENT

    A. **BIPA Only Applies to Biometric Data Used to Identify Specific Individuals.**

Plaintiff argues the technology at issue is regulated as a "voiceprint" under BIPA even though it does not identify specific individuals. This argument fails for multiple reasons.

        1. **The plain meaning of "biometric identifier" requires a "voiceprint" be used to identify a specific individual.**

As an initial matter, Plaintiff's reading ignores the plain text of the statute, which defines a "voiceprint" as a form of "biometric *identifier*." Instead, Plaintiff relies on a cherry-picked quotation from a 2017 opinion from the Illinois Office of the Attorney General ("OAG"), in which, Plaintiff claims, the OAG interpreted "voiceprint" to mean only "a record of mechanical measurement, but not a simple recording of a voice." (Opp. at 9.) Notably, however, Plaintiff omits a key aspect of the OAG's analysis, which expressly states that a voiceprint is "[a] distinctive pattern of curved lines and whorls made by a machine that measures human vocal sounds *for the purpose of identifying an individual speaker*." Pub. Access Op. No. 17-011, Ill. Off. of Att'y Gen., 2017 WL 10084298, at *3 (Ill. A.G. Aug. 14, 2017) (emphasis added) (quoting *Voiceprint*, BLACK'S LAW DICTIONARY (10th ed. 2014)).[1] Moreover, Plaintiff's argument ignores the OAG's interpretation of "biometric identifiers" in Illinois' FOIA; in a prior 2014 opinion, the OAG determined that a "biometric identifier" under that law "is commonly understood to refer to the measurement and analysis of a unique physical or behavioral characteristic *that identifies a person*, such as a fingerprint or voice pattern." *See* Pub. Access Op. No. 14-008, Ill. Off. of Att'y Gen.,

---

[1] Plaintiff's citation to Merriam Webster's Dictionary actually support's Walmart's position. (Opp. at 9 n.6 (quoting *Voiceprint*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/voiceprint (last visited Jan. 6, 2022)). Under this definition, a voiceprint is "an *individually distinctive* pattern of certain voice characteristics that is spectrographically produced." (*Id.* (emphasis added).) "Individually distinctive" means unique to a specific person, that is, a pattern that identifies, or distinguishes, an individual from others.

2014 WL 4407615, at *2 (Ill. A.G. Aug. 19, 2014) (emphasis added).² Plaintiff cannot credibly claim that the OAG defined voiceprint simply as a mechanical measurement of an individual's voice that does not identify a specific person.

### 2. BIPA's statutory structure also requires that voiceprints identify a specific individual.

Plaintiff further argues that BIPA's statutory structure shows that a "biometric identifier" need not affirmatively identify specific individuals. Specifically, because the definition of "biometric information" is limited to data "used to identify" a person (740 ILCS 14/10), Plaintiff contends the same limitation should *not* be read into the definition of "biometric identifiers" which contains no such clause. (Opp. at 11–14.) This fundamentally misinterprets BIPA's statutory scheme. *See Abrahamson v. Ill. Dep't of Pro. Regul.*, 606 N.E.2d 1111, 1118 (Ill. 1992).

While Plaintiff is correct that BIPA regulates two types of biometric data used to identify people—"biometric identifiers" and "biometric information"—he ignores the relationship between these two terms. First, BIPA identifies specific types of biometric data as "biometric identifiers" regulated by the law, including "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10 (including exceptions). Second, BIPA defines "biometric information" as data *derived* from these biometric identifiers, but with an important caveat—such derivative information is only governed by BIPA if it is also "used to identify" a person. By adding "used to identify" to the scope of "biometric information," the Legislature harmonized the two types of biometric data—BIPA regulates only biometric data that identifies an individual, whether

---

² Plaintiff also cites to an FBI document, but there, the FBI states that voice recognition "is a different technology than 'speech recognition,' which recognizes words as they are articulated, which is not a biometric." *Biometric Center of Excellence (BCOE): Modalities*, Fed. Bureau of Investigation, https://www.fbi.gov/services/cjis/fingerprints-and-other-biometrics/biometric-center-of-excellence-1/modalities-1 (last visited Jan. 6, 2022). As explained further below, the FAC plausibly alleged speech-recognition technology and nothing more.

that be a "biometric identifier" itself, which by definition identifies an individual, or "biometric information" derived from those identifiers. This is confirmed by at least three statutory indicators.

First, the term "biometric *identifier*" makes clear the Legislature intended the term to address only biometric data that identifies an individual.[3] In fact, Plaintiff agrees. (*See, e.g.*, Opp. at 14 ("In short, a biometric identifier *by its nature identifies the individual* from whom it was taken, making it subject to misuse if it is hacked or taken, as here." (emphasis added)).) This is confirmed by the specific categories of biometric data listed as "biometric identifiers," all of which are commonly understood to identify an individual (e.g., "fingerprints"). *See* 740 ILCS 14/10. Thus, the Legislature did not need to add "used to identify" to the definition of "biometric identifier" because it would have been redundant.

Second, the inclusion of "used to identify" in the definition of "biometric information" is needed to limit the scope of the term because information derived from biometric identifiers may otherwise have no connection to a specific person's identity. For example, one could take a set of iris scans (a form of "biometric identifiers" under BIPA) and determine what percentage of the target population had brown, blue, or green eyes. That aggregate information would be derived from biometric identifiers but could not itself identify any individual. BIPA was not intended to regulate that kind of non-identifying information. Indeed, the animating concern behind BIPA—that "[b]iometrics" present a greater risk than "other unique identifiers," 740 ILCS 14/5—is not implicated by such non-identifying derivative data. Therefore, "biometric information" is defined to include "information . . . based on an individual's biometric identifier" only if "*used to identify an individual*." 740 ILCS 14/10 (emphasis added); *see also Rivera v. Google, Inc.*, 238 F. Supp.

---

[3] *See* Erin Jane Illman, *Data Privacy Laws Targeting Biometric and Geolocation Technologies*, 73 Bus. Law. 191, 192 (2018) ("[B]iometric identifier, . . . as the name implies, is data associated with a person's biological marker that can later be used to identify that specific individual.").

3d 1088, 1095 (N.D. Ill. 2017) (explaining the legislature's goal was to ensure that "whatever a private entity does in manipulating a biometric identifier . . . the resulting information is still covered by [BIPA] *if that information can be used to identify the person*." (emphasis added)).

Third, BIPA requires possessors of "biometric identifiers" or "biometric information" to safeguard such data in a similar or "more protective" manner than they protect "confidential and sensitive information," (740 ILCS 14/15(e)(2)), which is defined to mean "information that can be used to *uniquely identify an individual* or an individual's account or property," (740 ILCS 14/10 (emphasis added)). If biometric identifiers did not identify an individual, it would make no sense for the legislature to regulate information that *cannot* be used to identify a specific person in a manner "more protective" than information that *can* be used to identify an individual.

Finally, Plaintiff's reading would lead to absurd results if "biometric *identifiers*" were not required to "identify" any specific person. *See, e.g.*, *People v. Hart*, 730 N.E.2d 1202, 1204 (Ill. App. Ct. 2000) ("Absurd constructions must be avoided."). For example, consider the scan of an eye that only determined eye color, but does not identify an individual. Or consider voice recording software that measures voice pitch and tone to help an individual sing better, but does not identify an individual. Under Plaintiff's interpretation, these two examples are "biometric *identifiers*" if they could be used in conjunction with other data to identify an individual. The Legislature did not intend BIPA—a statute intended to limit the "heightened risk for identity theft"—to regulate such *non-identifying* "identifiers." That would be absurd.

Plaintiff sidesteps the plain text of BIPA and fundamentally misconstrues its structure. At bottom, there is no statutory support for the argument that a measurement of a person's voice while the person speaks certain words is a "voiceprint" even if not used to identify a specific person.

### 3. To "identify" a person means to affirmatively say who it is without relying on some other means of identification.

Plaintiff unpersuasively contends that a voiceprint is not required to be the "sole" means of affirmatively identifying a specific individual so long as it can be used alongside a telephone number or other passcode to identify that individual. (Opp. at 11.) This argument is meritless.[4]

As discussed above, Plaintiff's interpretation defies the plain meaning of "identifier," which means to "identify" something. *See* Pub. Access Op. No. 14-008, 2014 WL 4407615, at *2 (explaining a biometric identifier "identifies a person"); *see also Identify*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "identify" as "[t]o prove the identity of (a person or thing)"). A piece of biometric data that does not identify an individual on its own is not protected by the statute. If, for example, pickers like Plaintiff were required to clock in and clock out of work using a passcode and an iris scan that only determined eye color and could not be used to identify the person, that eye-color scan would be a biometric identifier under Plaintiff's view because, he would argue, it is not required to be the sole means of identification to constitute a "biometric identifier." That makes no sense. The eye-color scan does not determine the person's identity. The passcode does, and the eye-color scan at best *might* exclude a person attempting to use an incorrect passcode. If the eye-color scan cannot affirmatively determine the identify of a specific person without reference to some other data, it cannot identify.

Plaintiff offers only a single case in support, one dealing with patent infringement claims regarding mobile banking technology. But the case, which does not involve, let alone address, BIPA, actually contradicts his argument. (*See* Opp. at 10 (citing *Peoplechart Corp. v. Wintrust*

---

[4] This argument does not help Plaintiff for a different reason. The FAC does not allege that the purported voiceprints were used in connection with the employee number to identify an individual. Instead, the FAC makes clear that identification only occurs after a user enters an employee number. *See infra* Section I.B.1. The purported voiceprint plays no role in identifying the user.

*Bank, N.A.*, --- F. Supp. 3d ----, 2021 WL 2350929, at *2 (N.D. Ill. June 9, 2021).) In *Peoplechart*, an inventor elected to utilize a passcode in connection with a voiceprint as a means of *dual authentication*: "A significant security feature . . . of the present invention is that there are *two separate codes* needed to access the user information: a voice print or a personal password . . . and a session ID which is specific to the particular access period." 2021 WL 2350929, at *2 (emphasis added) (quoting U.S. Patent No. 8,869,249). The inventor sued a bank for patent infringement; BIPA is never mentioned. *Id.* at *1. Again, Plaintiff provides no analysis of how this citation to a patent description corroborates his argument about a statutory definition in an unrelated claim under state law. While it is true an entity *could* require a *true* voiceprint and a separate passcode (or "two separate codes") to provide a more "significant security feature" to consumers, *id.* at *2, that does not negate the conclusion that, to be a "voiceprint" under BIPA, a recording must still identify a specific person based only on a spoken voice without the need to enter a passcode.

In fact, *Peoplechart* itself stands for the proposition that a voiceprint on its own must affirmatively identify a specific person. The patent at issue was "a method of protecting information on a computer system using *multiple forms of authentication*." *Id.* at *1 (emphasis added). The first authentication occurs when a user calls customer service to request access to certain information. *Id.* Customer service "authenticates that the caller is an authorized user" in order "to verify his identity." *Id.* Authentication includes "a voice print recording that matches a voice print of the user that is on record with the service provider." *Id.* In other words, a user is identified by his or her voiceprint *alone*. That is the first authentication utilized by the patent. Once the user has been identified by his or her voiceprint, a back-end server sends the user a unique "session ID" password and sets a specific date, time, and duration the user can access the requested information. *Id.* On the scheduled date and time, the user is required to enter his unique session

ID. *Id.* That is the second means of authentication utilized by the patent. If the correct session ID password is entered, the back-end server sends the information to the user's personal computer or phone. *Id.* Thus, contrary to Plaintiff's characterization of *Peoplechart*, the voiceprint there was used as the "sole" means to identify a user attempting to access information. If not, the user would not be issued a unique session ID and complete the additional, and independent, form of identification required. The fact that the inventor elected to utilize an additional means to identify the user does not change the fact that the voiceprint independently identified the user.

Under BIPA, biometric identifiers must identify a specific person, which means to affirmatively identify that person without relying on some other form of identification. If data *must* rely on other means to identify an individual, it by definition cannot be a biometric identifier.

    **4.  The case law overwhelmingly supports Walmart's interpretation of BIPA and Plaintiff fails to cite to a single decision holding the opposite**

Plaintiff fails to rebut the overwhelming weight of case law against him. As explained in the Motion, to plausibly state a claim under BIPA, a plaintiff must allege that the biometric data identifies a specific individual without needing to rely on some other means of identification.

Contrary to Plaintiff's argument, his interpretation of biometric identifiers has been rejected by a leading decision from this district. Despite his best efforts to contort *Rivera*, (*compare* Opp. at 9, 12 (citing in support) *with, id.* at 15–16 (distinguishing at length)), that decision rejects the arguments he makes here. First, Plaintiff's characterization of *Rivera*, that it defined biometric identifiers only as "a set of measurements," is misleading at best. (*See id.* at 15.) In *Rivera*, Google moved to dismiss the complaint arguing that its face templates were not biometric identifiers under BIPA. 238 F. Supp. 3d at 1092. When discussing biometric identifiers, *Rivera* explained that "the things on the list of biometric identifiers are just that—specific, biology-based measurements *used to identify a person* . . ." *Id.* at 1097 (emphasis added); *see also id.* at

1094 ("Each specific item on the list, not surprisingly, fits within the meaning of the term 'biometric identifier,' that is, a biology-based set of measurements ('biometric') that can be used to identify a person ('identifier')."). Despite Plaintiff's suggestion that *Rivera* defined biometric identifiers just once in passing, (Opp. at 15), *Rivera* was repeatedly unambiguous: "The bottom line is that a 'biometric identifier' is not the underlying medium itself, or a way of taking measurements, but instead is a set of measurements of a specified physical component (eye, finger, voice, hand, face) *used to identify a person*." 238 F. Supp. 3d at 1096 (emphasis added). In making this point, *Rivera* rejected the argument that biometric identifiers are simply measurements of a person's voice because that is just "the underlying medium itself"; instead, a mechanical measurement of a person's voice may be a biometric identifier if "used to identify an individual." *See id.* at 1095–96. Second, Plaintiff downplays the importance of *Rivera* because it did not explicitly state that biometric identifiers must be the sole means to identify a specific person. (Opp. at 15.) But *Rivera* did not need to hold as much because that proposition was not challenged in *Rivera*; and even according to Plaintiff, the proposition is inherent in the concept of a biometric identifier. (*See id.* at 14 ("[A] biometric identifier by its nature identifies the individual from whom it was taken . . .").) Plaintiff essentially criticizes the court in *Rivera* for not defining "identify."

Equally meritless is Plaintiff's attempt to distinguish *McGoveran v. Amazon Web Services, Inc.*, 488 F. Supp. 3d 714, 716 (S.D. Ill. 2020). As the court explained using its own words, a voiceprint can be understood as "the use of biological characteristics—one's voice—to verify an individual's identity without requiring the use of a passcode or answers to secret questions." *Id.* Plaintiff argues that the court was merely reciting the complaint's allegations when it said as much. (Opp. at 16 n.12.) But the court defined voiceprints as a general matter, on its own, in a manner not articulated by the complaint. *Compare McGoveran*, 488 F. Supp. 3d at 716, *with McGoveran*

*v. Amazon Web Servs., Inc.*, No: 3:20-cv-00031-NJR, ECF No. 1-1 ¶ 33 (S.D. Ill. filed Jan. 8, 2020). Second, Plaintiff argues *McGoveran* stands for the proposition that a voiceprint can be used in connection with some other passcode. (Opp. at 16 n.12.) *McGoveran* never said that. But even if a voiceprint can be used in some way with a different passcode, a true "voiceprint" must still identify an individual on its own. *See, e.g.*, *Peoplechart*, 2021 WL 2350929, at *2.

*Rivera* and *McGoveran* comport with other decisions interpreting BIPA that Walmart cites in its moving papers. (*See* Mot. at 8–10 (collecting cases).) Plaintiff attempts to distinguish these cases by claiming they do not concern "the full scope of cases that fall under BIPA"—yet tellingly, he does not cite to a single decision that supports his position that voiceprints are not required to affirmatively identify a specific individual. (*See* Opp. at 14 n.10.) The reason is simple: BIPA does not apply to any type of data that cannot affirmatively identify an individual. Allowing this case to proceed will expand the scope of BIPA and open the floodgates to litigants characterizing routine and outdated technology as biometrics to get past the pleading stage.

### B. The FAC Does Not Plausibly Allege Biometric Identifiers or Information

#### 1. Walmart's Motion is based entirely on Plaintiff's own allegations and does not cite any material not included in the FAC

Plaintiff argues that Walmart is improperly disputing the factual allegations in the FAC by relying on materials outside the pleadings. (Opp. at 6.) This is demonstrably false. Notably, the Opposition does not identify a single statement Walmart made that was not grounded in the FAC itself. (*Id.* at 6–8.) As detailed below, Walmart based its Motion on Plaintiffs' own allegations, which showed that the technology at issue could only identify an individual's voice after he or she enters a unique code, and that the purpose of the technology was to understand words and not identify the speaker of those words. *See, e.g.*, *Thompson v. Ill. Dep't of Pro. Regul.*, 300 F.3d 750, 753 (7th Cir. 2002) ("If the plaintiff chooses to provide additional facts, beyond the short and plain

statement requirement, the plaintiff cannot prevent the defense from suggesting that those same facts demonstrate the plaintiff is not entitled to relief.").

*Employee Numbers.* Contrary to Plaintiff's argument, the FAC makes clear that Vocollect cannot identify a particular picker's voice without an employee number. (*See* FAC ¶¶ 7, 45). A picker must enter his or her employee number first. (*Id.* ¶ 45.) "That action then loads that worker's voice template" onto a headset. (*Id.*; *id.* ¶ 7 ("Once the worker reports to work, he inputs his employee number into a wireless device . . . The voice template portion of his operator data file *then* loads into the device . . ." (emphasis added)).) Stated differently, if a picker speaks into a headset without entering an employee number, the FAC does not allege that Vocollect can identify the speaker by affirmatively matching the voice to the voice template in real time. That is fatal to Plaintiff's claim because it underscores that the purported voice templates are missing the hallmark of any biometric data: the identification of a specific individual. *See McGoveran*, 488 F. Supp. 3d at 716 (explaining that a voiceprint identifies an individual without requiring additional information); *Peoplechart*, 2021 WL 2350929, at *2 (same).

*Purpose.* Likewise, despite Plaintiff's protestations, his own pleading alleged the purpose of Vocollect is to understand words for purposes of inventory tracking, not identifying the speaker of those words. The FAC pled that Walmart's sole "material benefit" from using Vocollect is that "it *increases overall efficiency at distribution and fulfillment centers by identifying the individual's voice* patterns *as they give commands*." (FAC ¶ 11 (emphasis added).) No other "material benefit" is alleged by the FAC. The FAC reiterates throughout that the voice recordings are used to understand "the words being spoken by the worker in real time so that the worker can interact with the software." (*Id.* ¶ 43; *see, e.g.*, *id.* ("so that it can interact with that worker"). This occurs when a picker "is sent orders from a central worker management computer through his headset, and

executes those orders *by interacting and having a dialogue with the* voice recognition *software which responds to him* based upon the worker's voiceprint or template." (*Id.* ¶ 8 (emphasis added).) Finally, pickers like Plaintiff were Walmart's own employees and the FAC does not provide any factual details regarding why Walmart would want to identify its own employees by voice. Instead, by the FAC's own allegations, the purpose behind Vocollect is to understand a picker, when, for example, he or she is ready for the "next pick" to fulfill. (*See id.* ¶ 41 (alleging recordings included phrases such as "repeat pick" and "000"); *id.* ¶ 3 (listing a picker's job duties).) Vocollect's purpose is not to identify individuals.[5]

### 2. The FAC does not plausibly allege identification

Plaintiff argues that the FAC includes enough non-conclusory allegations giving rise to a plausible inference that Vocollect identifies individuals. (Opp. at 8–11.) It does not. Notably, Plaintiff does not quote the FAC's allegations when arguing in his Opposition he has sufficiently pled a violation under BIPA. (*See id.* at 8 (citing generally to the factual background section).)

While the FAC attempts to use the word "identify" and variations of the word throughout, none of these allegations saves Plaintiff. The FAC uses the word "identify" in two ways, neither of which is true to the plain meaning of the word. The FAC alleges that Vocollect "identif[ies]" a picker's voice but not that it affirmatively determines the picker's identity. (*See* FAC ¶¶ 11, 39–40, 42–43.) These references to "identifying a voice" are just parroting the statutory language

---

[5] Grasping for straws, Plaintiff argues that "the Motion should be denied" because Walmart moved under Rule 12(b)(6) as opposed to judgment on the pleadings under Rule 12(c). (Opp. at 2 n.1.) Plaintiff cites to an exchange at the initial status conference held on November 17, 2021 when the Court pondered about whether Walmart should have moved under Rule 12(c). (*See* ECF No. 33-1 at 9:4–5.) Walmart believes the FAC fails to state a claim under BIPA because the purported voice templates do not identify a specific person, as the Motion and Plaintiff's extensive arguments in the Opposition make clear. Moreover, Rule 12(c) provides that "a party may move for judgment on the pleadings" "[a]fter the pleadings are closed." The pleadings in this case are not closed, because Walmart has not yet filed an answer or other responsive pleading. A motion to dismiss under Rule 12(b)(6) is the proper vehicle to address Walmart's arguments.

while explaining a system that merely understands words, rather than identifying individuals. Vocollect "understand[s]" a picker's voice, as Plaintiff himself acknowledges. (*Id.* ¶ 40; *see also* ¶ 42 (Vocollect "essentially trains the system to recognize that worker's voice and verbal patterns . . .").) This is not the same as alleging Vocollect identifies the specific picker who is using a particular headset based on his or her words spoken in real time. Plaintiff is alleging speech-recognition technology, not (speaker's) voice-recognition technology.

Second, on several occasions, the FAC baldly claims that Vocollect can "identify" a specific picker (presumably meaning it can determine the picker's identity). However, each of these allegations is conclusory and regurgitates statutory text without providing any details. (*See* FAC ¶¶ 4–5.) For example, Plaintiff explains how Vocollect understands the *words* spoken by a worker in real time, but then makes the analytical leap that it "thus effectively recogniz[es] and identif[ies] the worker" (not just understanding what he or she has said) without providing any details. (*See id.* ¶ 9.) This Court should not credit the FAC's attempt to circumvent the federal pleading requirements. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (explaining a complaint must include "some specific facts to ground [the] legal claims" and "merely parrot[ing] the statutory language" is insufficient to survive a Rule 12(b)(6) motion).[6]

Plaintiff's allegation that Vocollect prevents "buddy check-ins" does not save his claim—and instead asks this Court to accept an absurd interpretation of what "identify" means. *See, e.g.*, *Identify*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Identify*, Merriam-Webster's Dictionary,

---

[6] Plaintiff cites an Illinois state trial court decision denying dismissal where the defendant apparently "ignored repeated allegations that [the] voice recordings at issue were 'voiceprints' under BIPA." (Opp. at 8 (citing Order, *Zaluda v. Apple, Inc.*, No. 2019-CH-11771 (Ill. Cir. Ct. Oct. 29, 2020).) The order Plaintiff attaches does not at all state that. (ECF No. 35-1 ("For the reasons stated on the record, Apple's Section 619.1 Motion to Dismiss is denied . . .").) Regardless, Plaintiff must satisfy *federal* pleading requirements in *federal* court.

https://www.merriam-webster.com/dictionary/identify (last visited Jan. 6, 2022) ("to know and say who someone is or what something is," rather than knowing and saying who someone is *not*). The Opposition argues that because Vocollect prevents buddy check-ins, that not only means Vocollect affirmatively identifies individuals, but it also does not work unless the right person is using the headset with the correct voice template loaded. (Opp. at 8.) First, Plaintiff did not actually plausibly allege affirmative identification as noted by Walmart throughout its Motion and the instant brief. Second, Plaintiff's suggestion that exclusion is somehow more far-reaching than affirmative identification gets the definition of "identify" backwards. Understanding that two things do not match is materially different from affirmatively matching two things. For example, a computer comparing two photographs and recognizing one individual has black hair and the other has blonde hair, thus excluding one, does not amount to identification. That is radically different from a computer looking at one photograph of an individual with black hair and then affirmatively identifying exactly who that person is based on the photograph. Data that can potentially exclude certain random individuals, but not affirmatively identify any particular person, is not biometric data regulated by BIPA. The Court should reject Plaintiff's attempt to interpret "identify" in this untenable manner.

Finally, Plaintiff cites *Pruitt v. Par-A-Dice Hotel Casino* for the proposition that bare and conclusory allegations of a BIPA violation are always enough to survive a motion to dismiss for failure to state a claim. 2020 WL 5118035 (C.D. Ill. Aug. 31, 2020). The plaintiffs in *Pruitt* visited a casino on multiple occasions, learned the casino used surveillance cameras, and alleged the casino was creating facial templates in violation of BIPA. *Id.* at *1. Although Plaintiff points to the denial of the motion to dismiss, he omits the court's rationale. In allowing the case to proceed, *Pruitt* held "the nature of the business must be considered." *Id.* at *2. While it may be

reasonable to infer that a casino, "which deals with significant amounts of money and usually has extensive security measures in place," would "invest in biometric-identifying equipment"—the same is not true for other businesses, such as gas stations which have little reason to invest in the same biometric-identifying equipment. *Id.* Here, unlike visitors to a casino, pickers such as Plaintiff were Walmart's own employees working at fulfillment and distribution centers. (FAC ¶ 3.) The FAC does not identify any reason why Walmart needed to identify its own employees by voice. For example, there is no allegation that Walmart used Vocollect for timekeeping and payroll purposes, which might plausibly suggest that the system was used to identify employees. *Cf. Figueroa v. Kronos Inc.*, 454 F. Supp. 3d 772, 779 (N.D. Ill. 2020). Instead, every detail provided in the FAC makes clear that Vocollect was used solely for purposes of managing inventory at fulfillment and distribution centers. According to the FAC, Vocollect's sole "material benefit" to Walmart is that "it *increases overall efficiency* at distribution and fulfillment centers by identifying the individual's voice patterns *as they give commands*." (FAC ¶ 11 (emphasis added).) Considering the "nature of [Walmart's] business" at fulfillment and distribution centers, Plaintiff has not plausibly alleged "biometric-identifying equipment." *See Pruitt*, 2020 WL 5118035, at *2. He has plausibly alleged speech recognition to facilitate communication, and nothing more.

Because the FAC does not plausibly allege that the purported voice templates affirmatively identify specific individuals, Plaintiff's BIPA claim should be dismissed.

### C. Dismissal with Prejudice is Appropriate

Futility warrants dismissal with prejudice. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012) (noting plaintiff "offer[ed] no argument at all against futility"). Plaintiff amended his complaint once already and the Opposition fails to identify any additional allegations that might plausibly state a claim for a BIPA violation if Plaintiff were given leave to amend. Thus, amendment is futile and the Court should dismiss this case with prejudice.

Dated: January 7, 2022

By: /s/ Michael G. Rhodes
    Michael G. Rhodes

ROBERT E. EARLES (6308936)
(rearles@cooley.com)

COOLEY LLP
444 W. Lake Street, Suite 1700
Chicago, IL 60606
Telephone: +1 312 881 6500
Facsimile: +1 312 881 6598

MICHAEL G. RHODES*
(rhodesmg@cooley.com)
WHITTY SOMVICHIAN*
(wsomvichian@cooley.com)
KYLE C. WONG*
(kwong@cooley.com)
ANUPAM DHILLON*
(adhillon@cooley.com)

COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

*Attorneys for Defendant*

**Admitted Pro Hac Vice*

# CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the forgoing **DEFENDANT WALMART INC.'S REPLY BRIEF IN SUPPORT OF THE MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM** was served on January 7, 2022 via the Court's ECF system to all counsel of record.

/s/ Michael G. Rhodes

261439196